## **TABLE OF CONTENTS:**

TABLE OF AUTHORITIES--------------------------------------------------------------iii

MEMORANDUM OF POINTS AND AUTHORITIES----------------------------------1

I.     INTRODUCTION------------------------------------------------------------------1

II.    ARGUMENT----------------------------------------------------------------------2

       A.     Standard for Awarding Reasonable Attorney's Fees and
              Litigation Expenses to the Defendants----------------------------------2

       B.     There Was No Good Basis for Any of the Charges in
              the Indictment---------------------------------------------------------------3

              1.     The Government's Position that It was Illegal for
                     The Thai Workers to Pay, and for Defendants and
                     Third Parties to Allegedly Receive, Recruitment Fees
                     Was Unfounded----------------------------------------------------3

              2.     The Forced Labor Conspiracy and Forced Labor
                     Charges Were Unfounded, Given that the Government
                     Had Direct Evidence that the Thai Workers Were Not
                     In Fear of Serious Economic Harm---------------------------------6

              3.     There is No Basis for the Government's Position That
                     Defendants Took Improper Deductions from the Thai
                     Workers' Paychecks and that the Thai Workers
                     Received Less Than What They Were Obligated to
                     Receive Under the Employment Contract---------------------------7

              4.     As Proven by its Own Witnesses, the Government's
                     Claim that the Thai Workers were Limited in Their
                     Freedom of Movement Was Not Supported by the Facts-------10

              5.     The Government Had Evidence that the Thai Workers
                     Voluntarily Chose to Live in Trailers and There Was
                     Nothing in the H2A Regulations that Prohibited the
                     Thai Workers from Living in the Trailers------------------------12

              6.     The Government Had No Evidence that the Thai
                     Workers' Passports Were Withheld-------------------------------13

7.    There Were No Misrepresentations Made on
      Applications Submitted to the Department of Labor,
      so the Government Had No Basis for Filing Visa Fraud
      Conspiracy Charges Against Defendants--------------------------14

8.    The Government Had No Basis for Alleging that
      Defendants Harbored Aliens for the Purpose of
      Financial Gain------------------------------------------------------15

9.    As Explained in the Earlier-filed Motion to Unseal
      Grand Jury Records, the Government had No Grounds
      to File the Obstruction of Justice Count Against
      Defendants----------------------------------------------------------16

C.    The Court Should Award Full Compensatory Fees and Costs to
      Defendants------------------------------------------------------------18

III.   CONCLUSION------------------------------------------------------------19

# TABLE OF AUTHORITIES

## CASES

*Arriaga v. Florida Pacific Farms, L.L.C.*
   305 F.3d 1228 (11th Cir. 2002) ----------------------------------------------------- 4

*Castellanos-Contreras v. Decatur Hotels, LLC*
   622 F.3d 393 (5th Cir. 2010) ------------------------------------------------------- 4

*Salazar-Martinez v. Fowler Brothers, Inc.*
   2011 WL 915675 (W.D.N.Y., Mar. 15, 2011) ------------------------------------- 4

*United States v. Braunstein*
   281 F.3d 982 (9th Cir. 2002) ---------------------------------------------------- 2, 3

*United States v. Manchester Farming Partnership*
   315 F.3d 1176 (9th Cir. 2003) ------------------------------------------------------ 2

## STATUTES

18 U.S.C. § 3006A ----------------------------------------------------------------- 1, 2
28 U.S.C. § 2412 § 617 --------------------------------------------------------------- 1
28 U.S.C. § 2412(d)(2)(A) --------------------------------------------------------- 18
28 U.S.C. § 2412(d)(2)(B) ---------------------------------------------------------- 2

## REGULATIONS

8 C.F.R. § 214.2(h)(5) (2003) ------------------------------------------------------- 4
8 C.F.R. § 214.2(h)(5)(xi)(A) (2009) ----------------------------------------------- 4
20 C.F.R. § 654.400, *et seq.* (2003) ----------------------------------------------- 12
20 C.F.R. § 655.100, *et. seq.* (2003) -------------------------------------------- 4, 12

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.   INTRODUCTION

Defendants Alec Souphone Sou and Mike Mankone Sou ("Defendants") hereby move for an Order awarding them reasonable attorney's fees and litigation expenses pursuant to the Hyde Amendment, § 617 of Pub. L. No. 105-119, 111 Stat. 2440 (November 26, 1997) codified at 18 U.S.C. § 3006A (Historical and Statutory Notes).[1]  As demonstrated below, the instant action should not have been prosecuted at all since the charges against Defendants were unfounded and the Government failed to conduct an adequate investigation into the relevant facts before bringing the Indictment against Defendants.[2]  In particular, discovery produced by the Government before trial and evidence offered during trial prior to the dismissal of all charges against Defendants demonstrate that there were no bases for the charges. Moreover, the lead prosecutor's admission that she misinformed the grand jury and the Government's key witness on the law relating to the Thai workers' payment, and Defendants' alleged receipt, of recruitment fees – the primary issue in the matter upon which several of the charges were based – further confirms that the Government's position was frivolous.

---

[1] The Hyde Amendment incorporates by reference the procedures delineated in 28 U.S.C. § 2412.  See § 617 ("Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under section 2412 of title 28, United States Code").

[2] Unless stated otherwise, all citations to the Indictment are in reference to the First Superseding Indictment filed on or about October 27, 2010 [Docket No. 127].

Under these circumstances, Defendants should be awarded their reasonable

attorney's fees and expenses under the Hyde Amendment.[3]

## II.   ARGUMENT

### A.   Standard for Awarding Reasonable Attorney's Fees and Litigation Expenses to the Defendants

Under the Hyde Amendment, a court may award reasonable attorney's fees

and litigation expenses to a prevailing criminal defendant where the Government's

position was vexatious, frivolous, or in bad faith.  *See* 18 U.S.C. § 3006A

(Historical and Statutory Notes).  The Ninth Circuit has determined that a prevailing

criminal defendant is entitled to an award under the Hyde Amendment upon a

showing of any one of the three grounds enumerated by the statute.  *United States v.*

*Manchester Farming Partnership*, 315 F.3d 1176, 1182 (9th Cir. 2003) (citation

omitted); *United States v. Braunstein*, 281 F.3d 982, 994 (9th Cir. 2002) (citations

omitted).  In *Braunstein*, the Ninth Circuit adopted the Eleventh Circuit's approach

of defining "frivolous" as meaning "groundless . . . with little prospect of success;

often brought to embarrass or annoy the defendant," which could be established by

showing that the Government's position was "foreclosed by binding precedent or so

---

[3] Each of the Defendants meets the definition of a "party" within the meaning of the
Hyde Amendment because, at the time the action was filed: (a) each Defendant was
an individual whose net worth did not exceed $2,000,000; and (b) each Defendant
was not an owner of an unincorporated business, partnership, corporation, association,
or organization the net worth of which did not exceed $7,000,000 and which had not
more than 500 employees.  *See* 28 U.S.C. § 2412(d)(2)(B).

2

obviously wrong as to be frivolous." *Braunstein*, 281 F.3d at 995 (citations omitted).  In applying this standard, the Ninth Circuit in *Braunstein* examined the failure of the Assistant United States Attorney in that case to properly follow up on investigatory leads and concluded that the defendant was entitled to attorney's fees under the Hyde Amendment. *Id.* at 996-997.

In the instant matter, Defendants were the prevailing party.[4]  In comparing the allegations in the Indictment with the discovery provided by the Government prior to trial and the evidence presented at trial, it is clear that the position of the United States was frivolous since the charges in the Indictment were unfounded and the Government failed to sufficiently investigate the case before bringing the charges against Defendants.

### B.   There Was No Good Basis for Any of the Charges in the Indictment

#### 1.   The Government's Position that It Was Illegal for the Thai Workers to Pay, and for Defendants and Third Parties to Allegedly Receive, Recruitment Fees Was Unfounded

The Government's primary claim was that Defendants allegedly received recruiting fees in connection with the Thai workers' employment at Aloun Farms."[5]

---

[4] On or about August 4, 2011, the United States Attorney for the District of Hawaii filed an Order which requested a dismissal of the Indictment against Defendants ("Order of Dismissal").  *See* RJN, Exh. "F."  The following day, the Court approved the Order of Dismissal.  *Id.*

[5] *See, e.g.,* Indictment at ¶ 7, ¶ 11 ("[i]t was further part of the conspiracy that [Defendants] . . . retained and profited from the Thai nationals' recruitment fees"), ¶ 21.

It was the Government's position that Defendants, knowing that the Thai workers had paid substantial recruitment fees and entered into "high-interest loans secured by their family homes and subsistence lands as collateral," compelled the workers' labor "through threats to deport the workers or send them back with no way to pay off their debt, thus holding the workers in fear of serious economic harm, including loss of family property."[6]

First, the Government's position was based on an incorrect reading of the law. The H2A regulations that were in effect during the relevant time period alleged in the Indictment did not prohibit employers and/or their contracted third parties from charging recruiting fees to foreign workers.[7] This was confirmed by

---

[6] *See* Indictment at ¶ 7, ¶ 10 ("[i]t was further part of the conspiracy that [Defendants] . . . knew each Thai national paid substantial recruitment fees to secure the job at Aloun Farm"), ¶ 17 (Defendants "compelled the continued labor and service of the Thai workers by threatening to deport the workers or send them home for complaining about wages, work conditions, confiscation of passports, and denial of promised visa extensions, knowing that such threats placed the workers in fear of serious economic harm, including loss of family property and subsistence land used to secured substantial debts, leaving the workers and their families homeless and destitute"), Counts 1-6 (Forced Labor Conspiracy and Forced Labor).

[7] *See* 20 C.F.R. § 655.100, *et. seq.* (2003); 8 C.F.R. § 214.2(h)(5) (2003) (containing no provisions prohibiting employers and/or their contracted third parties from charging recruiting fees to temporary foreign workers). *Compare with* 20 C.F.R §§ 655.105(o), (p) (2009) (implementing provisions effective January 17, 2009, prohibiting employers and/or their contracted third parties from charging recruiting fees to temporary foreign workers); 8 C.F.R. § 214.2(h)(5)(xi)(A) (2009) (same); *see also Salazar-Martinez v. Fowler Brothers, Inc*., 2011 WL 915675 (W.D.N.Y., Mar. 15, 2011) *Castellanos-Contreras v. Decatur Hotels, LLC,* 622 F.3d 393, 404 (5th Cir. 2010); *Arriaga v. Florida Pacific Farms, L.L.C.,* 305 F.3d 1228, 1244-45 (11th Cir. 2002).

the Government's own witness from the Department of Labor at trial.[8] Furthermore, the frivolousness of the Government's position is exemplified by the lead prosecutor's admission that she had misinformed the grand jury and the Government's key witness, Matee Chowsanitphon, that it was illegal under the H2A regulations in effect during the time period alleged in the Indictment to collect recruitment fees.[9] Mr. Chowsanitphon testified at trial that although he did not believe at the time of the events alleged in the Indictment that he had done anything wrong, the reason he pled guilty to a lesser charge in connection with this matter was because lead prosecutor Susan French had told him multiple times that he had committed a crime by accepting recruitment fees, so he ultimately came to believe that this was true.[10] Accordingly, the Government's position that it was improper for the Thai workers to pay, and parties to receive, recruitment fees under the H2A regulations in effect during the relevant time period was unsupported, which the Government would have known had it done a modicum of due diligence and researched the law applicable to the case.

---

[8] *See* RJN, Exh. "C" (Marie Chris Gonzales testimony given on August 2, 2011), at pp. 3-48:14-21.

[9] *See* RJN, Exh. "C" (Statements made by Susan French on August 2, 2011), at pp. 3-9:21 – 3-14:5.

[10] *See* RJN, Exh. "D" (Matee Chowsanitphon testimony given on August 3, 2011), at pp. 4-105:22 – 4-108:1, 4-110:5 – 4-111:9.

### 2.     The Forced Labor Conspiracy and Forced Labor Charges Were Unfounded, Given that the Government Had Direct Evidence that the Thai Workers Were Not In Fear of Serious Economic Harm

The allegations in the Indictment that Defendants compelled the Thai workers' labor through threats to send them back with no way to pay off the debt incurred by the workers' payment of recruitment fees, thus holding the workers "in fear of serious economic harm," are contradicted by evidence that had been in the Government's possession since the beginning of this case.

The contract that each of the Thai workers signed with Udon NT ("Udon Contract"), the recruiting company based in Thailand (the "Recruiter"), prior to coming to Aloun Farms clearly stated that the Recruiter would refund all of the recruitment fees paid by the Thai worker and pay for the Thai worker's transportation back to Thailand if the worker arrived at Aloun Farms and the job did not live up to his expectations.[11]  Based on this plain language, the workers could not have been in fear of serious economic harm if they returned to Thailand prematurely since they always had the option of getting all of their money back

---

[11] *See* RJN, Exh. "E" (Trial Exhibit 20) ("in the even[t] that the person seeking employment travels arrives [sic] in a country to work and does not get a job or gets a job but at a lower wage or in a position or with other benefits differing from that stated in this contract and the person seeking employment does not wish to do that work, or if the person seeking employment is terminated early, the authorized employment agent will arrange for the person seeking employment to travel back to Thailand, paying for all transportation, lodging, food, and other necessary expenses for the person seeking employment until the person seeking employment returns to Thailand and will refund the service fee and expenses collected from the person seeking employment in full or proportional with the length of time employed, whichever the situation dictates").

6

from the Recruiter, including the recruitment fees.  Therefore, there was no way Defendants could have compelled the workers' labor based on this supposed fear of economic harm.

The Government obtained the translation of the Udon Contract on January 7, 2009, more than seven months before the original Indictment was filed in this matter.[12]  Thus, at the time it filed the original Indictment and continuing through the filing of the First Superseding Indictment over one year later, the Government had direct evidence that contradicted the allegations relating to the Forced Labor Conspiracy and Forced Labor Charges.  Accordingly, the Government's position that Defendants compelled the Thai workers to work at Aloun Farms based on the workers' fear of serious financial harm was baseless.

> **3.    There Is No Basis for the Government's Position that Defendants Took Improper Deductions from the Thai Workers' Paychecks and that the Thai Workers Received Less Than What They were Obligated to Receive Under the Employment Contract**

The Indictment alleges that Defendants made improper deductions and did not pay the wage that was promised in the Aloun Farms employment contract

---

[12] *See* RJN, Exh. "E" (Trial Exhibit 20), first page.

signed by the Thai workers, "leaving the workers with minimal pay."[13]  This claim is unfounded for several reasons, all of which the Government should have known had it taken the time to properly analyze the evidence within its possession or conducted the minimal amount of investigation required for this case.

First, the Aloun Farms employment contract, which was signed by each of the Thai workers, clearly stated that meals would be deducted and taxes would be withheld.[14]  Therefore, any insinuation by the Government that Aloun Farms made improper deductions for meals and taxes is patently wrong.  Furthermore, the Thai workers were paid more than what they actually earned if one were to examine the number of hours that they actually worked at Aloun Farms compared to the salary they received.  Matee Chowsanitphon testified at trial that when he spoke to the Thai workers on the phone during the fall and winter of 2004, they complained that

---

[13] *See* Indictment at ¶ 16 ("[i]t was further part of the conspiracy that [Defendants] deducted from the workers' earnings charges . . . imposed for housing, meals, taxes, and payments towards high-interest loans . . ."), ¶ 25 ("In or about June 2004, [Defendants] . . . authorized an agent to sign a master employment agreement between Aloun Farm and each worker that contained the proposed terms and conditions of employment to include an hourly wage rate of $9.42 USD (later modified to $9.60 USD per hour) and the opportunity to work for between three and four years in the United States"), ¶ 31 ("In or about September 2004 . . . Defendants] . . . explained that Aloun Farm would not pay the workers the promised or contractual hourly wage; and informed the workers that they would be paid approximately $5.00 to $6.00 USD per hour or a flat monthly wage"), ¶ 35 (". . . [Defendants] deducted from the Thai workers' earnings for meals and housing").

[14] *See* RJN, Exh. "E" (Trial Exhibit 127) ("EMPLOYEE understands that and agrees that the EMPLOYER shall be responsible for all withholding of federal and state taxes from wages earned by the EMPLOYEE"; "At its discretion, EMPLOYER will provide EMPLOYEE three meals a day and will charge EMPLOYEE at the allowed rate, which currently is $8.59/day.")

they were not working a lot of hours due to heavy rainfall.[15]   Even though the Thai workers were not working many hours due to weather conditions, Aloun Farms was still paying them a salary which guaranteed that they would receive at least 3/4 of what they would have earned had they been able to work all the hours noted in the Aloun Farms contract.   Had the Government taken the time to investigate the weather conditions during the time the Thai workers were at Aloun Farms or had merely asked its cooperating witness, Mr. Chowsanitphon, about his communications with the Thai workers after he helped them settle in at the farm, it would have known that its allegations regarding Defendants' improper payment of the Thai workers were without merit.

Finally, to the extent that the Thai workers' paychecks showed that they appeared to be receiving little to no money for certain pay periods, this is due to the fact that several Thai workers chose to wire the bulk of their Aloun Farms paychecks to their families back in Thailand.   Some Thai workers had discussed the wires in their 302 Reports, so this is clearly a fact that the Government knew about, but chose to ignore.[16]

---

[15] *See* RJN, Exh. "D" (Matee Chowsanitphon testimony given on August 3, 2011), at pp. 4-115:7 – 4-118:6, 4-120:9-14.

[16] *See also* Declaration of Thomas H. Bienert, Jr. ("Decl. of Bienert"), filed concurrently herewith, Exh. "1," Bates-stamped nos. SOU_000358 – SOU 000359, SOU_001179 – SOU_001180.

Based on the foregoing reasons, the Government's position that Aloun Farms was not paying the Thai workers what was required under the employment contract and the H2A program is baseless.

> **4.    As Proven by Its Own Witnesses, the Government's Claim that the Thai Workers Were Limited in Their Freedom of Movement Was Not Supported by the Facts**

The Indictment alleges that Defendants "isolated the Thai workers by housing them in a two-story house surrounded by a cement wall in the front and a chainlink fence on the sides with a gate that was often locked and controlled only by Aloun Farm employees, limiting the workers' freedom of movement and contact with outsiders."[17]

However, the lead FBI agent on the case, Laura Salazar, testified at trial that the Thai workers had bicycles.[18]   Given that workers had bicycles, and could therefore venture out wherever they wanted, the Government's claim that the workers were limited in their freedom of movement makes no sense.  Agent Salazar also testified that she had never been to the Waianae house, where the Thai workers were allegedly confined, and had never interviewed any of the neighbors who lived

---

[17] *See* Indictment, ¶ 33; *see also* ¶ 36 ("[Defendants] and Aloun Farm employees controlled the movement of the Thai workers by escorting them to work each day and escorting them when they were taken outside of the premises controlled by the defendants and their co-conspirators").

[18] *See* RJN, Exh. "B" (Laura Salazar testimony given on July 29, 2011), at p. 75:4-9.

next door to this property and who observed and spent time with the Thai workers.[19] As is evident from Agent Salazar's testimony, the Government made no effort to talk to the third-party witnesses who arguably had the most knowledge about whether the Thai workers were restricted in their movements or otherwise mistreated before bringing forced labor charges against Defendants.[20]

At trial, Matee Chowsanitphon testified that the Thai workers did not have any limits placed on their movements, workers were allowed to come and go from the farm after working hours, and when workers would call him to give updates, they never complained about being confined.[21]  Again, these are basic questions that the Government could easily have asked this witness, who had been cooperating with the Government in this matter since 2009.

As demonstrated above, the Government's failure to conduct a proper investigation into the relevant facts underscores the frivolousness of their position that the Thai workers were limited in their freedom of movement.

---

[19] *See* RJN, Exh. "B" (Laura Salazar testimony given on July 29, 2011), at pp. 66:18 – 68:23, 74:8-13.

[20] *See* Declaration of Thomas M. Otake ("Decl. of Otake"), filed concurrently herewith, at ¶¶ 7-8, Exh. 1.

[21] *See* RJN, Exh. "D" (Matee Chowsanitphon testimony given on August 3, 2011), at pp. 4-114:19 - 4-116:20.

### 5. The Government Had Evidence that the Thai Workers Voluntarily Chose to Live in Trailers and There Was Nothing in the H2A Regulations that Prohibited the Thai Workers from Living in the Trailers

The Indictment alleges that Defendants "moved between 11 and 22 Thai workers to remote, mobile storage containers that had neither air conditioning nor indoor plumbing that had not been approved as agricultural workers housing as required by the H2A program." *See* Indictment, ¶ 34.  However, the 302 reports of the Thai workers demonstrate that the workers asked to live in trailers located at Aloun Farms, rather than the Waianae house, because living in the trailers meant that the workers did not have to make the long commute from the Waianae house to the farm in the mornings and afternoons and could therefore sleep in.

Moreover, the 2003 through 2005 H2A regulations did not prohibit foreign workers from choosing to live in accommodations other than the housing that was inspected and approved by the U.S. Department of Labor.  *See* 20 C.F.R. § 654.400, *et seq.* (2003) and 20 C.F.R. § 655.100, *et seq.* (2003) (containing no provisions prohibiting H2A workers from choosing to live in accommodations other than the housing that was inspected and approved by the U.S. Department of Labor).  As such, it was not a violation of the H2A regulations for the Thai workers to live in accommodations other than approved housing as long as Aloun Farms made the Waianae house available to them throughout the period of their employment, which they did.

Based on the foregoing facts and law, there is no support for the Government's position that the Thai workers were forced to live in "storage containers" or that their living in trailers on the farm was a violation of the applicable H2A regulations.

### 6. The Government Had No Evidence that the Thai Workers' Passports Were Withheld

Counts 7 and 8 of the Indictment allege that Defendants "knowingly and willfully" held two Thai workers "in a condition of document servitude" by "destroying, concealing, removing, confiscating, or possessing" the workers' passports in the course and with the intent of violating the Forced Labor statute, and for the purpose of preventing or restricting the workers' "liberty to move or travel, in order to maintain the labor or services" of said workers.[22]

However, the Government's key witness, Matee Chowsanitphon, testified at trial that the Thai workers' passports were returned to them shortly after Aloun Farms representatives used the passports to create worker identification cards.[23]  *See* RJN, Exh. D (Matee Chowsanitphon testimony given on August 3, 2011), at pp. 4-113:10 – 4-114:9.  Given this evidence, there was no basis for the Government to have filed charges of Document Servitude against Defendants.

---

[22] *See* Indictment, Counts 7 and 8; *see also* ¶ 15 ("[i]t was further part of the conspiracy that [Defendants] . . . confiscated most of the Thai workers' passports together with their visas when the workers arrived in the United States, thereby limiting the workers' freedom of movement").

[23] Even the Government conceded in its Opening Statement that Aloun Farms representatives returned the Thai workers' passports, it was just the Thai workers had to ask more than once before they were returned.  *See* Decl. of Bienert, at ¶ 2.

**7.    There Were No Misrepresentations Made on Applications Submitted to the Department of Labor, so the Government Had No Basis for Filing Visa Fraud Conspiracy Charges Against Defendants**

Count 9 of the Indictment alleges that Defendants made "material false representations and omissions" to the U.S. Department of Labor Employment and Training Administration in form 750 (ETA-750 Application for Alien Employment Certification) and form 790 (ETA-790 Agricultural and Food Processing Clearance Order).[24]   Although the Indictment fails to specifically identify what alleged misrepresentations or omissions were made, an issue well-documented in Defendants' previously-filed Motion for Bill of Particulars [Docket No. 183], it appeared from the Government's position at trial that the alleged misrepresentations and omissions related to: (1) Defendants' failure to disclose on the DOL forms that the Thai workers paid recruitment fees in connection with their employment at Aloun Farms; (2) Defendants' failure to disclose that they supposedly paid for the Thai workers' transportation to the United States out of the recruitment fees;[25] and (3) Defendants' representation regarding the terms and conditions of the Thai workers' rate of pay and working hours.[26]

---

[24] *See* Indictment, ¶ 12 and Count 9.  These forms will be collectively referred to as the "DOL Applications."

[25] The Indictment alleges that Defendants "paid for the workers' airfare to the United States out of the Thai workers' recruitment fees . . . knowing that Aloun Farms was responsible for paying the Thai workers' airfare to the United States in accordance with the terms and conditions of employment between Aloun Farm and U.S. Department of Labor"  *See* Indictment, ¶ 29.

[26] *See* Indictment at ¶ 23.

The first and second points are moot since, as explained above, there was nothing in the H2A regulations at that time which prohibited the payment of recruitment fees.  Therefore, there was no obligation to disclose the payment of recruitment fees on the DOL Applications and what parties allegedly did with the fees upon receipt (such as pay for the workers' travel) is of no consequence.[27]  With respect to the third point, the Government's claim that the Thai workers received less than what Defendants represented on the DOL Applications is unfounded for reasons explained in Section II.B.3 above.[28]  Accordingly, the Government had no viable basis for filing the Visa Fraud Conspiracy charges against Defendants.

### 8.   The Government Had No Basis for Alleging that Defendants Harbored Aliens for the Purpose of Financial Gain

Counts 10 and 11 of the Indictment allege that "beginning on or about March 1, 2005, and continuing through on or about October 27, 2010," Defendants

---

[27] The Government's witness from the Department of Labor confirmed that, during the relevant time period alleged in the Indictment, there was no requirement on the DOL Applications that the applicants disclose the payment of recruitment fees and that the portion of the DOL Applications where the employer affirms that the wage offered is not based on "commissions, bonuses, or other incentives" had nothing to do with recruitment fees.  *See* RJN, Exh. "C" (Marie Chris Gonzales testimony given on August 2, 2011), at pp. 3-48:22 – 3-49:7, 3-64:15 – 3-66:7.

[28] In any event, the Government's witness from the Department of Labor acknowledged that there was nothing on the DOL Applications which indicated that an employer could not pay H2A workers a set, flat rate salary as a way of covering the hourly wage that would be paid to the workers, as represented on the DOL Applications; she also acknowledged that even she, as a government employee, is assigned an hourly wage, even though she is paid a set salary twice a month.

*See* RJN, Exh. "C" (Marie Chris Gonzales testimony given on August 2, 2011), at pp. 3-49:8 – 3-51:1.

"knowing and in reckless disregard of the fact that [TM and KT], [aliens] . . . remained in the United States in violation of the law, did conceal, harbor, and shield [TM and KT] from detection . . . for the purpose of commercial advantage and private financial gain."[29]

The Government's position is frivolous since there is no evidence that Defendants knew that TM and KT were illegal aliens.  In fact, Defendants were informed and believed that TM and KT were in the country legally, as evidenced by the fact that TM and KT had employment authorization cards from the Government and were actively pursuing ways in which they could continue to remain in the United States legally.[30]  Moreover, there is no evidence that TM and KT were paid anything less than other Aloun Farm workers, so there is nothing to support the allegation that Defendants permitted TM and KT to stay and work at the farm "for the purpose of [Defendants'] commercial advantage and private financial gain." Therefore, Counts 10 and 11 of the Indictment were frivolous.

### 9.    As Explained in the Earlier-Filed Motion to Unseal Grand Jury Records, the Government Had No Grounds to File the Obstruction of Justice Count Against Defendants

Count 12 of the Indictment alleges that "[o]n or about July 19, 2010, in a proceeding before the United States District Court for the District of Hawaii, [Defendants] . . . corruptly obstructed, influenced and impeded an official

---

[29] "TM" has been identified as Thai worker Thanakorn Mukdamuang and "KT" has been identified as Thai worker Kuson Thasak.

[30] *See* Decl. of Bienert, Exh. "1," at Bates-stamped nos. SOU_001344 – SOU_001350, SOU_001354 – SOU_001360, SOU_001363 – SOU_001377.

proceeding . . . by offering as evidence in court, a video that they designed and created, knowing that the information included in the video contained false and misleading representations."

As discussed thoroughly in Defendants' previously-filed Motion to Unseal Grand Jury Records, the Government's filing of this charge was without merit because: (1) there was no evidence that any witnesses appearing in the Video lied or obstructed justice; (2) there was no evidence that Defendants knew the witnesses lied, even if it turns out the witnesses did; (3) there was no evidence that Defendants participated in the Video; (4) there was substantial evidence that lead prosecutor Susan French chose to ignore defense counsel's unrebutted claims that Defendants had no involvement in the Video; (5) the Government failed to conduct an adequate investigation into the facts before filing the charge, such as attempt to discern who was involved in the creation of the Video; (6) the Government's legal theory of obstruction was unsupported, and in fact contradicted, by the relevant case law and statutes; and (7) Ms. French's statements to defense counsel strongly indicated that this charge was motivated more by prosecutorial vindictiveness than an objective assessment of the evidence.[31]   For these reasons, the Government's position with respect to Defendants' alleged obstruction of justice was frivolous.

---

[31] *See generally* RJN, Exh. "A" (Motion to Unseal Grand Jury Records).  For the sake of efficiency, Defendants incorporate by reference the arguments set forth in this Motion.

### C.   The Court Should Award Full Compensatory Fees and Costs to Defendants

Defendants were forced to spend substantial sums of money in order to defend against the frivolous allegations against them.   Accordingly, the Court should rule that the Government should compensate Defendants for their reasonable costs and expenses incurred in their criminal defense.   Defendants are in the process of finalizing the fees and costs expended by various attorneys, investigators, consultants, and one expert, and will be submitting a separate supplemental pleading next week which will itemize all costs and fees incurred by Defendants in the defense of this action.

Given the circumstances of this case, the attorney's fee award should not be limited by the hourly cap provided in 28 U.S.C. § 2412(d)(2)(A).   Under that provision, the cap of $125.00 per hour on attorney's fees may be increased if the Court determined that "an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." *Id.*

The complex nature of the case, the range of specialized expertise, and the thousands of hours of preparation that was necessitated due to the Government's filing of these frivolous charges warrant the granting of an award that compensates

Defendants at the actual hourly rates charged by his attorneys, which are well within prevailing market rates and are reasonable under the circumstances.[32]

## III. CONCLUSION

It is clear that the Hyde Amendment was intended to address inequitable circumstances such as those presented in the case at bar. For the past two years, Defendants have been forced to expend enormous amounts of money to defend their innocence and have suffered incalculable damage to their business reputation and goodwill. As demonstrated above, the charges brought against Defendants were frivolous and the Government failed to conduct a proper investigation into the facts of the matter. For these reasons, Defendants respectfully request that the Court enter an order awarding them their reasonable attorney's fees and litigation expenses incurred in the defense of this action.

Dated: September 2, 2011
                      BIENERT, MILLER & KATZMAN, PLC

By: _____
                      Thomas H. Bienert, Jr.
                      Anne A. Uyeda

                      Attorneys for Defendant
                      ALEC SOUPHONE SOU (01)

---

[32] As explained in the Decl. of Bienert, Defendant Alec Sou paid the law firm of Bienert, Miller & Katzman, PLC ("BMK") the amount of $297,020.00 ("BMK Fee Charged") pursuant to his retainer agreement with BMK, even though the BMK billing statements, which will be submitted next week, reflect that the total time billed in this matter (1,818.20 hours) multiplied by BMK's usual hourly rates greatly exceed the BMK Fee Charged. *See* Decl. of Bienert, ¶ 5.

Dated:  September 2, 2011

THOMAS M. OTAKE
ATTORNEY AT LAW


By: S/Thomas M. Otake
Thomas M. Otake

Attorneys for Defendant
MIKE MANKONE SOU (02)